# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Sandra G. Malinowski ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CV 50233 |
| ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra G. Malinowski brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

## BACKGROUND

On January 26, 2012, plaintiff filed her Title II disability application, alleging that she suffered from degenerative spinal disorders, fibromyalgia, and pulmonary problems. She claimed a disability onset date in April 2011, although she stopped working in early 2010 and had worked for most of the previous 30 years at various jobs.

On September 10, 2014, a hearing was held before an administrative law judge ("ALJ"). The hearing consisted mostly of plaintiff's testimony, as no medical expert testified. Plaintiff testified that she was 60 years old, weighed 260 pounds, and lived with her husband. Her daughter and granddaughter had been living there since the middle of June (*i.e.* for approximately three months). Plaintiff spent "most of [her] day in [a] recliner" with her legs elevated. R. 50. She was depressed and no longer did activities, such as reading, which she used

1

to enjoy. Several times during the hearing, she pejoratively referred to her life. R. 63, 99 ("I'm getting very depressed here thinking about my pathetic life.").

She mentioned several times that she had problems getting medical treatment because of lack of insurance. R. 53, 63. She was thankful for her husband who did a lot of the work around the house. She had tried various treatments for her back and leg pain, including epidurals and pain medications. Her back pain flared up if she walked 50 feet or tried to sweep or mop or swing her arms. Her daily pain was a 5 to 6 on a 10-point scale. She used an inhaler and nebulizer several times a day. She had been diagnosed with fibromyalgia and her legs would "throb 24 hours a day." R. 76. She was taking medication for depression, which was diagnosed in 2008. When asked how her depression affected her, she stated: "I just feel like I want to die." R. 77. She used to be a workaholic who loved to work, and found it "very depressing" not to be able to work anymore. She could stand for 5 minutes and sit for 30 minutes at a time. In her last job, she kept her feet elevated by putting them on pillows resting on a trash can. Her treating physician, Dr. Hoffman, told her to keep her feet elevated. During the hearing, she kept her feet elevated on a chair, and had to stand up at one point to relieve the pain. She wore shorts and sandals to the hearing because long pants, socks, and shoes irritated her skin.

On January 9, 2015, the ALJ found plaintiff not disabled. The ALJ found that plaintiff suffered from numerous impairments, but found that she had the residual functional capacity ("RFC") to do sedentary work subject to certain restrictions.[1] The 16-page opinion contains a

---

[1] These impairments were the following: "degenerative disease of the lumbar spine, left shoulder, of the ankles and of the hips; chronic obstructive pulmonary disease (COPD)/asthma; history of gastric bypass surgery; hypertension; history of coronary artery disease (CAD); history of chronic venous insufficiency; fibromyalgia syndrome; history of peripheral neuropathy; history of insomnia; history of plantar fasciitis; and obesity." R. 22.

2

lengthy narrative of plaintiff's numerous medical visits, followed by a shorter "analysis" section.[2] The ALJ's rationales are discussed below.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

In her opening and reply briefs, plaintiff asserted multiple arguments for remand. Some were more developed than others; several arguments overlap and arguably could have been

---

[2] The seemingly usual practice of ALJs to dump mass quantities of record evidence in the narrative portion of the decision with very little analysis later in the decision is a recurring problem. *Edmonson v. Colvin*, No. 14 CV 50135, 2016 U.S. Dist. LEXIS 32019, *19-20 (N.D. Ill. Mar. 14, 2016). A narrative is not the same as an analysis. *Underwood v. Colvin*, No. 15 CV 50249, 2016 U.S. Dist. LEXIS 175423, *4-5 (N.D. Ill. Dec. 20, 2016); *Tucker v. Colvin*, No. 14 CV 50021, 2015 U.S. Dist. LEXIS 149905, *11-12 (N.D. Ill. Nov. 4, 2015). This Court is not alone in its criticism of this practice. *See, e.g.*, *Chuk v. Colvin*, 2015 WL 6687557, *8 (N.D. Ill. Oct. 30, 2015) ("summarizing a medical history is not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion"). Indeed, a Social Security Ruling states so. SSR No. 96-8p ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

3

combined with others. After reviewing the briefs, Court finds that a remand is warranted based on the following two major arguments: (1) the ALJ played doctor in analyzing the evidence; and (2) the ALJ's credibility analysis was improper.

**I.        Playing Doctor.**

Plaintiff argues that the ALJ failed to fully develop the record and should have called an expert to testify about her physical and mental problems. These arguments are connected to plaintiff's claim that the ALJ repeatedly played doctor by interpreting technical medical reports. This Court agrees with this argument; several specific examples are discussed below in connection with other arguments.

The Government's main response is to note that the ALJ, although not calling a medical expert, did rely on two State agency doctors (Dr. Kenney and Dr. Hinchen) who in turn relied on a consultative examiner (Dr. Karri).[3] The Government's observation is accurate insofar as it goes, but it overlooks important countervailing factors. First, these two doctors were able review "only a fraction" (specifically 15 pages) of the much larger record later reviewed by the ALJ.[4] Dkt. #25 at 1. Second, they reviewed these pages "nearly two years prior to the [ALJ's] decision." *Id.* As plaintiff notes, these doctors found that plaintiff suffered from only a few impairments; whereas, the ALJ found that there were fourteen. Third, the ALJ only gave these opinions "some weight." The ALJ's rejection of some of these recommendations means that he imposed some limitations based on his own layperson analysis.[5] Fourth, it is undisputed that

---

[3] Dr. Kenney provided a written evaluation in September 2012 (Ex. 2A), and Dr. James Hinchen provided one in March 2013 (Ex. 4A).
[4] The 15-page number comes from plaintiff's opening brief. The Government has not questioned its accuracy.
[5] Dr. Kenney believed that plaintiff was capable of doing significantly more than what she testified she could do given that she was 60 years old, weighed 260 pounds, and spent most of the day in a recliner. Dr. Kenney found she could (among other things) occasionally climb ladders, ropes, and scaffolds and could frequently crouch, stoop, kneel, and crawl. R. 122. These limitations seem optimistic to say the least. The ALJ wisely did not follow them. The Court pauses briefly to comment on the Administration's continued use of rope climbing as a work activity. As exemplified in *The Goldbergs*, memories of rope climbing in gym class may cause trauma in people of a certain age.

4

plaintiff suffers from numerous problems, some of which were hard to diagnose or involve what appear to this Court are technical medical issues, including fibromyalgia, spinal problems, and breathing problems. She was treated by numerous doctors; the record is lengthy and filled with many technical medical terms. Plaintiff also complains that the ALJ never fully considered the combined effect of these many impairments, and ignored the additional complicating factor of her obesity. This complexity is yet another reason why the ALJ (and this Court) would have benefitted from the calling of an expert witness, especially regarding her physical problems.[6] Indeed, the Administration's own internal working document would appear to require the ALJ to seek a medical expert under these circumstances. HALLEX I-2-34A.2. On remand, the ALJ must call a medical expert or otherwise develop the record to address these questions. HALLEX I-2-5-34A.1.

## II. Credibility Analysis.

Plaintiff's next challenges the finding that her testimony was not credible. An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning"). In addition, an ALJ's credibility finding will be reversed if it is based on an error of fact. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other

---

*See The Goldbergs*, "Dungeons and Dragons, Anyone?" Season 3, Episode 20 (Aired April 6, 2016). Moreover, except for Navy Seals and CrossFit junkies, who climbs ropes these days, even for work?

[6] The evidence regarding plaintiff's depression is less developed and less voluminous than the evidence bearing on her physical problems. The Court, therefore, leaves it up to the ALJ's discretion on remand as to whether a mental health expert should also be called.

evidence"). Plaintiff challenges three parts of the credibility analysis. The Court agrees that these arguments, taken together, raise enough questions to require a remand.

**Inconsistent Treatment.** As one reason for finding plaintiff not credible, the ALJ stated the following:

> [T]he claimant has not generally received the type of medical treatment one would expect for a totally disabled individual as there has been very little treatment for said conditions and that she did fairly well. There are gaps in treatment, with little treatment from April 2011 until May 2012 (although prescriptions were refilled) and limited treatment until 2013.

R. 31. Plaintiff does not challenge the factual premise that there were treatment gaps, but argues that they were explained by her lack of insurance, an explanation which the ALJ ignored.

The Court agrees. It is well-established that an ALJ has a duty to first ask a claimant about, and then explore a claimant's explanations regarding, treatment inconsistencies. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

The Government concedes that the ALJ failed to consider plaintiff's explanations in the opinion, but argues that the failure was harmless error. The Government seems to place the blame on plaintiff, arguing that plaintiff "failed to identify specific record evidence, other than her own subjective report, that her limited treatment and gaps in treatment were solely due to her inability to pay." Dkt. #21 at 6. This argument is not persuasive. The Government seems to

6

assume that a plaintiff must come forward with greater proof than her "own subjective report" (itself a vague term), but does not cite to any case or SSR regulation imposing such a requirement nor explain what type of proof would be sufficient. In this Court's experience, a claimant's subjective statement has generally been considered adequate, at least absent some contrary evidence casting doubt on it. Neither the Government, nor the ALJ has suggested (much less cited to evidence to show) that plaintiff's testimony was possibly untruthful on this point.

Moreover, the record contains evidence that plaintiff did not merely raise this issue at the hearing, but also contemporaneously raised it during medical visits. For example, Dr. Karri noted that plaintiff "did not have surgery because she could not afford it." R. 340. Plaintiff also raised the issue in her written submissions. Specifically, in her Disability Report, she stated the following: "I am not taking any medication as I have no money to pay for them. I do have some outdated [inhalers] that I use if [I] need to and the doctor will not give me new prescriptions because I have not seen him in a year because I have no insurance and I cannot afford to go to the doctor." R. 254. The ALJ cited to this same report to support the claim that plaintiff was only taking Advil for her problems, but omitted this explanation. R. 32.[7]

In sum, the Court cannot conclude that this error was harmless. The record is not clear as to how long these gaps were or whether they matched up with the periods where plaintiff did not have insurance. Also, the lengthy record reflects that plaintiff had many doctor visits and treatments. Thus, it is not clear to this Court that she failed to pursue treatment. One possibility is that there were no obvious treatments for these problems. This is an additional reason why a medical expert should be called. Finally, the ALJ referred many times in the opinion to the

---

[7] In fairness to the ALJ, the explanation came much later in the report and thus may have been inadvertently overlooked. As for the point about taking only Advil, the ALJ also seemed to overlook (or at least give little weight to) the fact that plaintiff was taking multiple prescribed medications for most of the treatment period. *See*, *e.g.*, R. 28 (from neurologist's report: "Gabapentin was not helping and neither was Vicodin. Vicoprofen and Flexeril were prescribed.").

7

alleged lack of treatment, suggesting that this rationale played a central role in the decision. On remand, the ALJ should explicitly address this issue.

**Normal Gait.** Another credibility rationale that plaintiff's criticizes is the following:

> The claimant is not credible as far as complications from degenerative conditions, fibromyalgia and history of peripheral neuropathy. Records often note that she had a good gait and was ambulatory.

R. 31-32. Plaintiff complains that this analysis is vague, relies on cherry-picking, and is an instance of the ALJ playing doctor. These are valid criticisms.

The analysis is vague in several respects. To begin with, it lumps together several conditions (degenerative spinal problems and fibromyalgia), making it difficult to clearly analyze them individually according to medically-accepted criteria. Another problem is the ALJ's claim that plaintiff was "often" found to have a "good gait." The word "often" is not tied to any objective medical metric. The ALJ also did not provide any citations to the record. So it is not clear how frequent (or infrequent) this finding was. Relatedly, plaintiff complains that the ALJ did not fairly or consistently consider contrary evidence showing that her gait was *not* normal.[8] Although the ALJ referred to some of this evidence in the long narrative section, as the Government notes, the ALJ did not mention it in the analysis paragraph quoted above, raising a question as to how the ALJ reconciled these divergent lines of evidence.

More broadly, the ALJ seems to assume this one observation (gait) was fundamental to the diagnosis of the multiple conditions referred to in the first sentence. However, the ALJ did not explain these assumptions nor, importantly, rely on any medical testimony. Perhaps the ALJ's intuitions will turn out to be correct, but on the current record it is not obvious to this

---

[8] As summarized in plaintiff's brief, this evidence included the following: Dr. Karri noted that plaintiff "had a wide based gait and could not heel/toe walk, squat or tandem gait"; Dr. Dave "indicated [that] Plaintiff suffered from an antalgic gait and suffer from paraspinal muscle spasm"; Dr. Samuelson "recorded [that] Plaintiff walked with a slight limp"; and plaintiff's physical therapist "noted [that] [she] suffered from an awkward gait and 'waddles sideways, possibly due to decreased spinal mobility.'" Dkt. #16 at 13.

Court that a good gait would tend to rule out, say, fibromyalgia or would prove that plaintiff's pain was less than claimed. Again, this is why supporting medical testimony is important.

**Somewhat Normal Daily Activities.** The third credibility rationale criticized by plaintiff is the ALJ's conclusion that plaintiff's daily activities were "somewhat normal." R. 32. In her opening brief, plaintiff argued that the ALJ improperly "equate[d] an ability to take care of one's basic needs to an ability to work." Dkt. #16 at 13. However, the plaintiff's argument is conclusory, only a short paragraph, as she did not discuss any specific examples of how the ALJ's summary was supposedly misleading. Still, it is true, as both this Court and the Seventh Circuit have repeatedly noted, that a claimant often can perform household activities under a more flexible standard and that such activities are typically judged by a lower standard of performance. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). On the other hand, as the Government notes, it is not improper for the ALJ to consider these activities to show that plaintiff "can do more than she claims, and is not credible." Dkt. #21 at 7 (citing *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013)). The Seventh Circuit explained the distinction between these divergent uses of daily activities in *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (daily activities cannot be used to determine a claimant's ability to perform full time work, but may be used to compare inconsistencies between the claimant's daily activities and the claimant's testimony to determine credibility). But like plaintiff, the Government does not discuss the specific activities.

After reading the ALJ's summary of plaintiff's daily activities and then comparing it to the underlying source materials, this Court finds that the ALJ's summary painted a misleading picture by filtering out any counter-evidence, leaving a sanitized and overly rosy picture. The

9

ALJ summarized the activities as follows: "[Plaintiff] maintains her own grooming and hygiene, shops for food, goes to the library, drive[s] a car, manage[s] finances/pay[s] bills, [does] household chores (dusting, vacuuming), and use[s] a computer. She also began caring for her granddaughter." R. 32. As so stated, the ALJ's characterization seems justified. But the problem is that the description omits important qualifying details, several of which were the subject of extensive questioning at the hearing. Consider, for example, the assertion that plaintiff cared for two-year-old granddaughter. The ALJ's description leaves out that plaintiff did so mostly while sitting in her recliner, even changing diapers while sitting in the recliner; that plaintiff's husband was there to help out (for example, lifting the granddaughter into plaintiff's lap for the diaper changing); and that plaintiff's daughter, the mother of the child, lived there too and was primarily responsible for the granddaughter. Also, plaintiff described her granddaughter as the one positive thing in her life, suggesting that plaintiff was willing to exert special effort to keep her there. The ALJ also noted that plaintiff did grocery shopping, but left out pertinent details in the above description. Plaintiff testified that grocery shopping was the "big outing" (one of the few times she went out of the house), that she used an electric cart or leaned on a grocery cart, that she rested on benches in the store, and that her husband was again there to help.

In sum, based on the above two major arguments, the Court finds that a remand is warranted. The Court need not address plaintiff's third major argument, which is that the Appeals Council erred in how it considered post-hearing evidence consisting of a pulmonary function test that plaintiff believes shows she met Listing 3.04 for cystic fibrosis. In their briefs, the parties argue over what was the specific ground upon which the Appeals Council decided this issue. Rather than attempt to untangle this issue based on limited evidence, it is better to leave

this issue for the ALJ to address in the first instance on remand.[9] The Court also will not address plaintiff's remaining arguments, as they are either undeveloped or duplicative, and in any event, can be considered on remand as part of the ALJ's complete review of all the evidence. As noted above, one issue the ALJ should specifically address is the combined effect of all of plaintiff's many conditions.

There is one additional argument, however, that the Court will comment on briefly. It was only really raised for the first time in the reply brief, and even then was not more than a sentence long. Dkt. #25 at 2. Plaintiff states that her treating physician, Dr. Hoffman, answered an equivalence form (Ex. 19F) addressing whether plaintiff met Listing 4.11 based on a condition called "chronic venous insufficiency." Plaintiff does not provide any further explanation, nor summarize what Dr. Hoffman specifically concluded. It is unclear why plaintiff did not give this argument more attention because it invokes the treating physician rule, which requires that a treating physician's opinion be given controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record. 20 C.F.R. §404.1527(c)(2); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ then must determine what specific weight, if any, the opinion should be given. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009). To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (referring to the factors as a "required checklist").[10] Failure to apply checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist).

---

[9] In addition, plaintiff failed to address this argument in her reply brief.
[10] These factors are as follows: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the

The ALJ considered the Hoffman opinion, but did not follow the two steps described above. Although the ALJ mentioned the phrase "controlling weight," the ALJ clearly did not follow the second step by applying the checklist. Among other things, the ALJ did not discuss the length and nature of Dr. Hoffman's treatment relationship with plaintiff. In this Court's view, the failure to *explicitly* apply the checklist is, by itself, a ground for remand. However, even if this Court were to follow the more implicit approach, the Court would likely still find that the ALJ's analysis was insufficient. The ALJ concluded that Dr. Hoffman's interrogatory answers were "sharply" at odds with, or at least not supported by, "the other evidence of record." R. 32. The ALJ asserted that the medical record contained "relatively few references to edema" and no references to "statis dermatitis or varicosities" (these are apparently signs of chronic venous insufficiency). In support of this claim, the ALJ cited to records from 2008-2009, August 2012, December 4, 2013, and January 22, 2014, all of which supposedly showed that plaintiff had no edema. In his opinion, Dr. Hoffman concluded that plaintiff had a lower extremity edema and opined that she was required to elevate her legs above her heart every day for most of the day, a condition which if accepted would likely prevent her from working full-time. R. 561.

The ALJ's analysis suffers from many of the same concerns discussed above. The ALJ cites to certain records indicating no edema, but it is not clear whether, and to what extent, there were *also* reports finding that she did have edema. The ALJ's statement that there were "relatively few" references to edema suggests that, in fact, there were some, which would provide some support for Dr. Hoffman's opinion. As for the evidence the ALJ did cite to, it was from 2008 until January 2014. Dr. Hoffman's interrogatories answers were dated as of September 15, 2014. Thus, another question is whether this condition only fully emerged after

---

physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

these earlier visits. In addition to these evidentiary uncertainties, the larger concern again arises that the ALJ was playing doctor. Relying on selected snippets from medical reports over a five-year span, the ALJ basically concluded that plaintiff did not have any edema (sometimes referred to as swelling according to the Mayo Clinic website) and that she was not suffering from chronic venous insufficiency. In short, the ALJ concluded that Dr. Hoffman was wrong in his diagnosis. ALJs do not diagnose claimants. On remand, the ALJ should explicitly follow the treating physician rule and should obtain a medical opinion about this condition.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: January 18, 2017  By: _____
Iain D. Johnston
United States Magistrate Judge